BILL LOCKYER Attorney General SUSAN DUNCAN LEE Deputy Attorney General
THE HONORABLE DENNIS HOLLINGSWORTH, MEMBER OF THE STATE SENATE, has requested an opinion on the following questions:
1. In preparation for submitting a bond measure to the electorate for approval, may a community college district use district funds to hire a consultant to conduct surveys and establish focus groups to assess the potential support and opposition to the measure, the public's awareness of the district's financial needs, and the overall feasibility of developing a bond measure that could win voter approval?
2. In preparation for submitting a bond measure to the electorate for approval, may a community college district use district funds to hire a consultant to develop and implement a strategy for building the broadest possible coalition in support of the measure and the financial support for a campaign by, for example, assisting the district chancellor in scheduling meetings with civic leaders and potential campaign contributors in order to gauge their support for the bond measure?
3. After a community college district has placed a bond measure on the ballot, consistent with its charter, articles, and bylaws, may the district's nonprofit foundations, student body associations, and other auxiliary organizations independently determine to contribute their own privately raised funds to a political action committee established specifically to advocate voter approval of the bond measure?
 CONCLUSIONS
1. In preparation for submitting a bond measure to the electorate for approval, a community college district may use district funds to hire a consultant to conduct surveys and establish focus groups to assess the potential support and opposition to the measure, the public's awareness of the district's financial needs, and the overall feasibility of developing a bond measure that could win voter approval.
2. In preparation for submitting a bond measure to the electorate for approval, a community college district may not use district funds to hire a consultant to develop and implement a strategy for building the broadest possible coalition in support of the measure and the financial support for a campaign by, for example, assisting the district chancellor in scheduling meetings with civic leaders and potential campaign contributors in order to gauge their support for the bond measure if the purpose or effect of such actions serves to develop a campaign to promote approval of the bond measure by the electorate.
3. After a community college district has placed a bond measure on the ballot, consistent with its charter, articles, and bylaws, the district's nonprofit foundations, student body associations, and other auxiliary organizations may independently determine to contribute their own privately raised funds to a political action committee established specifically to advocate voter approval of the bond measure, subject to applicable campaign disclosure requirements.
 ANALYSIS
It is well settled that a public agency may not use public funds to campaign for one side or the other in an election contest. (Stanson v. Mott (1976) 17 Cal.3d 206; Schroeder v. Irvine City Council (2002) 97 Cal.App.4th 174; League of Women Voters v. Countywide Crim. Justice Coordination Com. (1988)203 Cal.App.3d 529 ("League of Women Voters"); Miller v. Miller (1978) 87 Cal.App.3d 762; 73 Ops.Cal.Atty.Gen. 255 (1990).) The three questions presented for analysis seek clarification concerning how that general rule may apply to a community college district and its affiliated organizations in the context of a ballot measure authorizing the issuance of bonds for the support of the district.
The specific statute applicable to community college districts that embodies the general prohibition against using public funds for partisan campaigning is Education Code section 7054,[1] which states:
 "(a) No school district or community college district funds, services, supplies, or equipment shall be used for the purpose of urging the support or defeat of any ballot measure or candidate, including, but not limited to, any candidate for election to the governing board of the district.
 "(b) Nothing in this section shall prohibit the use of any of the public resources described in subdivision (a) to provide information to the public about the possible effects of any bond issue or other ballot measure if both of the following conditions are met:
 "(1) The informational activities are otherwise authorized by the Constitution or laws of this state.
 "(2) The information provided constitutes a fair and impartial presentation of relevant facts to aid the electorate in reaching an informed judgment regarding the bond issue or ballot measure.
". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ."[2]
1. Evaluating Bond Measure Feasibility
We are first asked whether a community college district may use district funds to hire a consultant for the purpose of evaluating the likelihood of the electorate's approval of a bond measure. We conclude that a district may use its funds to gather information and evaluate the potential for the adoption of a bond measure by the electorate.
We note first that the governing board of a community college district has broad discretion to make expenditures in furtherance of district purposes. (Cal. Const., art. IX, § 14; § 70902; see Service Employees Internat. v. Board of Trustees (1996)47 Cal.App.4th 1661, 1666.) Further, a district board has express authority to place a bond measure on the ballot "when in its judgment it is advisable" to do so. (§ 15100; see § 70902, subd. (b)(5).) It is well settled that government officials may exercise such additional powers as are necessary for the efficient administration of powers expressly granted by statute, or as may fairly be implied from the statute granting the powers. (Calfarm Ins. Co. v. Deukmejian (1989) 48 Cal.3d 805, 824; Dickey v. Raisin Proration Zone (1944) 24 Cal.3d 796, 810.) In this case, we believe that the express power to place a bond measure on the ballot when the district board finds it advisable to do so clearly implies that the board has the power to make reasonable expenditures for the purpose of gathering information in order to exercise its discretion in an informed manner. (See, e.g., Kennedy v. McInturff (1933) 217 Cal. 509, 514 [express power to sell bonds implies additional power to hire broker].)
Of course, a district board may not exercise its powers in a manner that is in conflict with, inconsistent with, or preempted by any law. (§ 70902, subd. (a); see Service Employees Internat. v. Board of Trustees, supra, 47 Cal.App.4th at p. 1666.) Thus, while a district board plainly has the power to expend public funds in connection with determining whether to place a bond measure on the ballot, the issue presented here concerns how far the district may go without running afoul of section 7054 and the general legal principles it embodies. (See § 8314; Stanson v. Mott, supra, 17 Cal.3d at pp. 209-210; Schroeder v. Irvine City Council, supra, 97 Cal.App.4th at p. 185; League of Women Voters, supra, 203 Cal.App.3d at p. 539; Miller v. Miller, supra, 87 Cal.App.3d at pp. 768-769.)
We believe that the court's decision in League of Women Voters, supra, 203 Cal.App.3d 529, fully supports the authority of a community college district to use its funds for a variety of efforts directed at drafting a bond measure. Among the types of publicly — funded activities that the Court of Appeal approved were research into the need for the proposed initiative measure in question; formulating, drafting, and considering various substantive proposals for the measure; investigating potential problems associated with specific proposals; and investigating the probable expense and alternative means of successfully qualifying the proposed measure for the ballot. (Id. at pp. 552-553.) As part of its analysis, the court drew a distinction between actions taken before and those taken subsequent to placement of the measure on the ballot:
 "Clearly, prior to and through the drafting stage of a proposed initiative, the action is not taken to attempt to influence voters either to qualify or to pass an initiative measure; there is as yet nothing to proceed to either of those stages. The audience at which these activities are directed is not the electorate per se . . .; there is no attempt to persuade or influence any vote. [Citation.] It follows those activities cannot reasonably be construed as partisan campaigning. Accordingly, we hold the development and drafting of a proposed initiative was not akin to partisan campaign activity, but was more closely akin to the proper exercise of legislative authority." (Id. at p. 550.)
Likewise, here, the "audience" for the proposed activities regarding polling and establishing focus groups is not the electorate per se, since there is as yet no bond measure. "It is only at the point the activities . . . cross the line of improper advocacy or promotion of a single view in an effort to influence the electorate" that the use of public funds becomes improper. (League of Women Voters, supra, 203 Cal.App.3d at p. 554.) Of course, not every activity in connection with a bond measure will necessarily be proper if taken before the measure is placed on the ballot. Activities directed at swaying voters' opinions are improper, even pre-filing. (See 73 Ops.Cal.Atty.Gen., supra, at p. 266.)[3] But the activities proposed here-evaluating the public's awareness of the district's financial needs, measuring potential support for a bond measure, and assessing the overall feasibility of passing a bond measure-cannot fairly be characterized as partisan campaigning.
The fact that the information obtained might prove to be of use in an ensuing campaign "does not, in itself, necessitate the conclusion public funds were expended improperly." (League of Women Voters, supra, 203 Cal.App.3d at p. 554.) Where the district's and its consultant's actions are taken in furtherance of reaching an informed decision on whether to proceed with a bond measure and what the terms should be, the use of public funds is permissible. However, under some circumstances, the donation to or use by a political campaign of such information will give rise to campaign reporting obligations under the Political Reform Act of 1974 (Gov. Code, § 81000 et seq.). (See Cal. Code Regs., tit. 2, § 18215; 2000 Cal. Fair-Pract. LEXIS 52 [Hoffman Advice Letter, No. A-00-074]; see also Fair Political Practices Com. v. Suitt (1979) 90 Cal.App.3d 125, 128-132.)[4]
We conclude that in preparation for submitting a bond measure to the electorate for approval, a community college district may use district funds to hire a consultant to conduct surveys and establish focus groups to assess the potential support and opposition to the measure, the public's awareness of the district's financial needs, and the overall feasibility of developing a bond measure that could win voter approval.
2. Promoting Bond Measure Voter Approval
The second question presented is whether a community college district, in preparation for submitting a bond measure to the electorate, may use district funds to hire a consultant to develop and implement a strategy for building the broadest possible coalition in support of the measure and the financial support for the campaign. Examples of contemplated activities include assisting the district chancellor in scheduling meetings with civic leaders and potential campaign contributors to gauge their support for the bond measure. We conclude that such actions may not be taken if the purpose or effect is to develop a campaign to promote approval of the bond measure.
Courts have repeatedly noted the difficulty in drawing a bright line in distinguishing between what is a proper and an improper expenditure of public funds in connection with election activities. In Stanson v. Mott, supra, 17 Cal.3d 206, for instance, the Supreme Court noted that whether an agency's publicly financed informational brochures constituted improper campaign material "depends upon a careful consideration of such factors as the style, tenor and timing of the publication; no hard and fast rule governs every case." (Id. at p. 222, fn. omitted.) In League of Women Voters, supra, 203 Cal.App.3d 529, the court found that determining whether public funds may be used to identify a sponsor for a proposed initiative measure was "somewhat . . . problematical," and cautioned that the persuasiveness of the arguments for and against such an expenditure "depends largely on the approach the task force [employs] in identifying a willing proponent." (Id. at p. 553.)[5]
Here, too, we believe that deciding whether a community college district may use its funds to develop and implement a strategy for building the broadest possible coalition in support of a bond measure and the financial support for an election campaign depends upon whether the district is performing a proper informational role or an improper advocacy role. In Stanson v. Mott, supra, 17 Cal.3d 206, the court provided examples to illustrate the difference between the two:
 ". . . With respect to some activities, the distinction is rather clear; thus, the use of public funds to purchase such items as bumper stickers, posters, advertising `floats,' or television and radio `spots' unquestionably constitutes improper campaign activity [citations], as does the dissemination, at public expense, of campaign literature prepared by private proponents or opponents of a ballot measure. [Citations.] On the other hand, it is generally accepted that a public agency pursues a proper `informational' role when it simply gives a `fair presentation of the facts' in response to a citizen's request for information [citations] or, when requested by a public or private organization, it authorizes an agency employee to present the department's view of a ballot proposal at a meeting of such organization. [Citations.]" (Id. at p. 221.)
For its part, the court in Miller v. Miller, supra,87 Cal.App.3d 762, referred to a federal law prohibiting federal agencies from using their funds to influence Congress and found that certain congressional hearings provided "excellent background material on the difficult problem of delineating proper from improper agency lobbying," quoting in part:
 " `. . . Members of the Administration or other Federal officers or employees may apparently express their views publicly on the need for certain legislation and programs. However, it appears that federally financing or aiding publications or advertisements or the like which are part of a publicity campaign advocating the passage or defeat of Federal legislation with the intention or likelihood of garnering public support to influence Members of Congress on a specific issue or piece of legislation, would be that type of prohibited activity contemplated by the statutory provision.' " (Id. at p. 771.)
More recently, in League of Women Voters, supra,203 Cal.App.3d 529, the court considered whether a county had impermissibly performed an advocacy role when public employee members of a task force met with various individuals and organizations in an effort to identify and secure a proponent for their proposed initiative measure. The court indicated that the determination could turn on "whether the task force aggressively advocated to these individuals and organizations their participation as proponents or simply requested their suggestions . . . ." (Id. at p. 553.)
Subsequently, in Schroeder v. Irvine City Council, supra,97 Cal.App.4th 174, the court held that the rules and regulations of the Fair Political Practices Commission in interpreting the Political Reform Act of 1974 could be consulted in determining whether or not an expenditure of public funds was for unlawful advocacy purposes. (Id. at p. 185.) In Schroeder, the issue considered was whether a city had made an illegal expenditure of public funds by financing a campaign to encourage voter registration and participation, at a time when the city had an interest in the approval of a pending ballot measure. After closely examining the commission's regulations defining "political expenditures," the court concluded that the funds spent on the voter registration program "were political expenditures, and unlawful under Stanson, only if the communications either expressly advocated, or taken as a whole unambiguously urged, passage or defeat" of the pending ballot measure. (Id. at pp. 187-188.)[6]
Finally, in Governor Gray Davis Com. v. American Taxpayers Alliance (2002) 102 Cal.App.4th 449, 470-472, the court narrowly construed the term "express advocacy" as used in the Political Reform Act of 1974 and in the regulations of the Fair Political Practices Commission to include only those communications that expressly advocate for or against an electoral position by using explicit words of action.
Accordingly, a community college district board may not spend district funds on activities that form the basis for an eventual campaign to obtain approval of a bond measure. For instance, district resources may not be used to recruit or organize supporters for a campaign or raise funds for the campaign. (See League of Women Voters, supra, 203 Cal.App.3d at p. 558 [expenditures made in anticipation of supporting a measure once it is on the ballot come within reporting requirements of Political Reform Act of 1974]; In re Fontana (1976) 2 FPPC Ops. 25 [expenditures made in support of proposal become reportable after proposal becomes a ballot measure].)
We conclude that in preparation for submitting a bond measure to the electorate for approval, a community college district may not use district funds to hire a consultant to develop and implement a strategy for building the broadest possible coalition in support of the measure and the financial support for a campaign by, for example, assisting the district chancellor in scheduling meetings with civic leaders and potential campaign contributors in order to gauge their support for the bond measure if the purpose or effect of such actions serves to develop a campaign to promote approval of the bond measure by the electorate.
3. Auxiliary Organizations Promoting Bond Measure Voter Approval
An "auxiliary organization," as we use the term here, is one whose goals and purposes support the mission of a community college district or one or more of its colleges. (See 84 Ops.Cal.Atty.Gen. 41, 45-46 (2001); 82 Ops.Cal.Atty.Gen. 102, 104-105 (1999).) Auxiliary organizations may take a number of forms, including fund-raising nonprofit foundations, student organizations, and entities providing commercial services for the benefit of a district or one of its colleges. (§§ 72670, 72674, 76060.) Auxiliary organizations may, but need not, be established and operated under the auspices of a community college district board. (See 84 Ops.Cal.Atty.Gen., supra, at pp. 45-46; 82 Ops.Cal.Atty.Gen., supra, at p. 105; § 72673; Cal. Code Regs., tit. 5, § 59250, subd. (b).) The question presented is whether auxiliary organizations may independently determine to contribute their own privately raised funds to a political action committee established to advocate voter approval of a bond measure placed on the ballot by a community college district.[7] We conclude that they may do so.
California courts have generally recognized auxiliary organizations as private entities rather than as public agencies or as part of the public bodies they seek to aid or assist. (California State University, Fresno Assn., Inc. v. Superior Court (2001) 90 Cal.App.4th 810, 826, 829; Wanee v. Board of Directors (1976) 56 Cal.App.3d 644, 648-649; see also Coppernoll v. Board of Directors (1983) 138 Cal.App.3d 915, 918-920.) We have previously reached the same conclusion. (47 Ops.Cal.Atty.Gen. 8, 10 (1966).) Since an auxiliary organization is not a public entity, its use of its own privately raised funds is not subject to the prohibition against the use of "public funds" for political purposes.[8]
We recognize that an auxiliary organization that is officially established under the auspices of a community college district board (§ 72670) may sometimes involve the participation of district officials. (E.g., § 72670, subds. (a), (d).)[9] Also, auxiliary organizations that are established in this manner are required to act in conformance with the district's regulations, and to submit to district oversight of their financial operations, including an annual audit and report to the district. However, we believe these provisions are insufficient to make an auxiliary organization's funds "public funds" for purposes of section 7054 and the general principles which it embodies. A community college district board does not have the power to convert an auxiliary organization's funds to its own use.
It is to be recognized that auxiliary organizations, particularly those established under the official auspices of a community college district, may enjoy benefits from their association with the district, such as the use of the district's name, reputation, and facilities.[10] Preventing abuse of these advantages is sufficient reason for giving community college districts the responsibility to exercise oversight of an auxiliary organization's financial affairs. For this reason, we do not regard the statutory provisions for financial oversight as an indication that an auxiliary organization's funds are equivalent to a district's funds for purposes of the prohibition against using public funds for advocacy purposes. Moreover, auxiliary organizations, as non-governmental organizations, are entitled to a degree of freedom under the First Amendment to make financial contributions to political causes. (See generally Buckley v. Valeo (1976) 424 U.S. 1; Pacific Gas Electric Co. v. City of Berkeley (1976) 60 Cal.App.3d 123.) We assume for purposes of this opinion that any such contributions would be consistent with the laws and bylaws governing the establishment and operation of the donor organization. We assume also that any such contributions would be consistent with the First Amendment interests of the members of the donor organization. (See generally Keller v. State Bar of California (1990) 496 U.S. 1; Abood v. Detroit Board of Education (1977) 431 U.S. 209.)
We conclude that after a community college district has placed a bond measure on the ballot, consistent with its charter, articles, and bylaws, the district's nonprofit foundations, student body associations, and other auxiliary organizations may independently determine to contribute their own privately raised funds to a political action committee established specifically to advocate voter approval of the bond measure, subject to applicable campaign disclosure requirements.
[1] All references hereafter to the Education Code are by section number only.
[2] Government Code section 8314, with more general applicability, similarly provides:
 "(a) It is unlawful for any elected state or local officer, including any state or local appointee, employee, or consultant, to use or permit others to use public resources for a campaign activity, or personal or other purposes which are not authorized by law.
". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 "(d) Nothing in this section shall prohibit the use of public resources for providing information to the public about the possible effects of any bond issue or other ballot measure on state activities, operations, or policies, provided that (1) the informational activities are otherwise authorized by the constitution or laws of this state, and (2) the information provided constitutes a fair and impartial presentation of relevant facts to aid the electorate in reaching an informed judgment regarding the bond issue or ballot measure.
". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ."
[3] Similarly, an expenditure of funds pre-filing for post-filing activities that are aimed at influencing the electorate would be improper.
[4] For specific application of campaign reporting requirements of the Political Reform Act of 1974, the Fair Political Practices Commission has primary responsibility for interpreting and implementing this statutory scheme (Gov. Code, §§ 83111, 83112), including providing advice regarding applicable requirements (Gov. Code, § 83114).
[5] In the instant situation, no proponents need be identified since the district itself is authorized to place the bond measure on the ballot, in contrast with the situation in League of Women Voters, supra, 203 Cal.App.3d 529, where the County of Los Angeles was required to turn the initiative over to proponents forthe purpose of attempting to qualify the measure for the statewide ballot.
[6] The city had not urged a particular result in any election and had only briefly mentioned the ballot measure at issue as part of a list of numerous matters that would be voted upon by the electorate.
[7] Here, the privately raised funds would exclude any "public funds" as that term is used in Penal Code sections 424-426.
[8] In contributing its own funds to a bond measure campaign, an auxiliary organization may become subject to campaign disclosure obligations under the Political Reform Act of 1974. (See Gov. Code, §§ 84100-84108 [organization of committees], 84200-84225 [filing of campaign statements]; see also §§ 82013 ["committee" defined], 82015 ["contribution" defined].) Similarly, any direct campaign expenditures in the campaign over the bond measure may also become subject to campaign disclosure rules under certain circumstances. (See fn. 4.)
[9] Any activities of district employees involving auxiliary organizations for political purposes may only take place on their own time, not during their compensated time as district employees. (See Fair Political Practices Com. v. Suitt, supra, 90 Cal.App.3d at pp. 127-132.) "Campaign related activities" are broadly defined. (See Gov. Code, § 82015, subd. (b)(2)(C); Cal. Code Regs., tit. 2, § 18420.)
[10] However, an auxiliary organization may not use facilities provided to it by a community college district for political purposes any more than the district itself may do so. We address here only the expenditure of private funds by an auxiliary organization for purposes of contributing to a ballot measure campaign.