[Civ. No. 17707. Third Dist. Mar. 6, 1979.]

FAIR POLITICAL PRACTICES COMMISSION,
Plaintiff and Appellant, v.
TOM SUITT et al., Defendants and Respondents.

[Civ. No. 17708. Third Dist. Mar. 6, 1979.]

FRIENDS OF TOM SUITT, Plaintiff and Respondent, v.
FAIR POLITICAL PRACTICES COMMISSION,
Defendant and Appellant.

**COUNSEL**

Daniel H. Lowenstein, Robert M. Stern, Natalie E. West, Lee C. Rosenthal, and Barbara Campbell for Plaintiff and Appellant and for Defendant and Appellant.

Ronald A. Zumbrun, John H. Findley and Sandra R. Johnson as Amici Curiae on behalf of Plaintiff and Appellant and Defendant and Appellant.

Blease, Vanderlaan & Rothschild, Coleman A. Blease and Richard L. Gilbert for Defendants and Respondents and for Plaintiff and Respondent.

## OPINION

**PARAS, J.**—This is a consolidated appeal from a portion of the judgment entered in Friends of Tom Suitt v. The Fair Political Practices Commission (FPPC), Sacramento Superior Court action No. 270251 (hereinafter called Suitt v. FPPC), and from the judgment entered in Fair Political Practices Commission v. Suitt et al., Sacramento Superior Court action No. 270419 (hereinafter called FPPC v. Suitt).

The issue in both cases is whether the Assembly Democratic Caucus of the state Legislature (Caucus) is a "person" within the meaning of the Political Reform Act, Government Code section 81000 et seq.[1]

The legal dispute arises out of the activities of Michael O'Key, an employee of the State of California and more specifically of the Caucus, an association of the Democratic members of the California Assembly. The Caucus is authorized by statute and by Assembly resolution to hire and direct employees, whose salaries are paid by the state.

The FPPC v. Suitt complaint alleges that in May and June of 1976, O'Key was relieved of some of his normal working responsibilities to enable him to perform campaign work for the Suitt Committee (Committee), a political committee working for the reelection of Assemblyman Tom Suitt. O'Key spent at least three of the twenty working days of May and at least three of the twenty-two working days of June on campaign activities. On these days he solicited campaign contributions and engaged in and was substantially responsible for campaign strategy and planning, coordination of the activities of volunteer workers, and preparation of the campaign budget. Such work was done at the behest of Suitt.[2]

[1]Section references henceforth are to the Government Code, unless otherwise indicated.

[2]These allegations are disputed by respondents. For purposes of this decision however they must be assumed true. (Cf. 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 800, pp. 2413-2414.)

While allegedly performing campaign work, O'Key continued to receive his full state salary. He received no compensation from Suitt or the Committee; and neither the Committee nor anyone else reimbursed the state for his salary accumulation while doing the campaign work.

Pursuant to sections 84200 and 84210, the Committee was required to file periodic campaign disclosure statements, revealing contributions received and disbursements made. The FPPC contends that as a consequence of O'Key's campaign work the Committee received a nonmonetary contribution in the form of personal services, which it was required to disclose on the campaign disclosure statements covering the two months. The Committee made no such disclosure.

Pursuant to its civil enforcement authority, the FPPC commenced FPPC v. Suitt on November 17, 1977, for injunctive relief and damages, seeking to have the court compel Suitt, the Committee, and its treasurer Harry Brent (respondents) to file amended campaign statements making the disclosures; the action also sought damages equal to the monetary value of the uncompensated personal services. (§§ 91001, 91004.)

Several days before the FPPC v. Suitt complaint, and in anticipation thereof, the Committee filed the Suitt v. FPPC action, based on the same facts but seeking declaratory, injunctive and extraordinary relief. Its thrust was that the Legislature is not a "person" within the meaning of sections 82047 (which defines "person") and 84210, subdivision (g) (which requires the Committee to report the name of each "person" from whom a reportable contribution has been received), hence it had no obligation to report O'Key's services.

On December 16, 1977, a hearing was held in Suitt v. FPPC, which by stipulation of counsel was deemed a trial on the merits of the complaint. The trial court agreed with the Committee and ruled accordingly. In FPPC v. Suitt the court sustained a demurrer without leave to amend. Appeals were taken by FPPC in both cases. On July 6, 1978, pursuant to uncontested motion, we consolidated them.

The Political Reform Act was adopted as an initiative measure in June 1974, effective January 7, 1975. It covers a wide range of matters involving public officials, including lobbying, conflict of interest, and campaign disclosure. Section 81002 recites the public policy applicable to campaign disclosures and declares "Receipts and expenditures in election campaigns should be fully and truthfully disclosed in order that the voters may be fully informed and improper practices may be inhibited."

(§ 81002, subd. (a).) To accomplish this purpose, section 84200 et seq. require all candidates and committees supporting or opposing candidates and ballot measures to file periodic campaign disclosure statements. The act also requires records to be kept (§ 84100), prohibits anonymous and cash contributions (§§ 84300, 84304), and regulates payments by agents and intermediaries (§§ 84302, 84303).

Campaign statements must disclose, inter alia, the "full name of each *person* from whom a contribution or contributions totaling fifty dollars ($50) or more has been received . . . ." (Italics added.) (§ 84210, subd. (g).) The term "contribution" includes not only cash and cash-equivalent contributions but also nonmonetary or "in-kind" contributions of goods and services. Specifically, "contribution" is defined to include "the payment of compensation *by any person* for the personal services or expenses of any other person if such services are rendered or expenses incurred on behalf of a candidate or committee without payment of full and adequate consideration." (Italics added.) (§ 82015.) This provision is intended to prevent a potential subterfuge; it assures that when an employer allows an employee to spend compensated time in campaign work for a campaign committee, the committee must report that benefit, just as it would if the employer made a direct cash contribution to the committee which in turn used it to pay a campaign worker.

The term "person" is broadly defined in section 82047 to mean ". . . an individual, proprietorship, firm, partnership, joint venture, syndicate, business trust, company, corporation, association, committee, and *any other organization or group of persons acting in concert."* (Italics added.) The emphasized segment of the definition, broad as it is, appears at first blush to include the Caucus and other governmental entities like it, but because governmental entities are not actually specified respondents offer several reasons for the supposition that they were intentionally omitted.

 Respondents assert first that "much of what is done by the Legislature, and consequently by legislative aides, is done for a political purpose," therefore application of the act to the Legislature would result in ". . . an interference with the normal functioning of the sovereign powers of the Legislature." Just how this comes about is not clear to us; presumably the claim is that the effort of legislators would be hampered by their inability to distinguish work on a political campaign from work on legislation in deciding what is or is not a contribution under section 82015. As the FPPC points out in response, this argument is not

convincing; for even if the definition of "contribution" might be unclear as applied to certain legislative activities not here involved, the Act obviously does not infringe on the performance of Suitt's official duties insofar as the activities alleged in this case are concerned. The use of state employees by a legislator's campaign committee to solicit contributions, plan campaign strategy, coordinate volunteers, and prepare the campaign budget, all at state expense, is in no way a proper part of a legislator's official functions; that is not to be questioned. If it is to be done at all, the public has a serious interest in its disclosure.

The Legislature's asserted difficulty here, if indeed it exists, is no different from that faced by government officials in distinguishing between the improper expenditure of public funds for "campaign" purposes and the proper expenditure thereof for "informational" activities. In *Stanson* v. *Mott* (1976) 17 Cal.3d 206, 223 [130 Cal.Rptr. 697, 551 P.2d 1], the Supreme Court resolved that problem by holding governmental officials liable only if they fail to use due care in authorizing the expenditure. Analogously the Legislature need not be absolutely perfect in distinguishing between the performance by its employees of proper legislative functions as distinguished from election campaigning; it should nonetheless exercise due care in separating the two activities.

Respondents emphasize however that the Legislature is so political that it is impossible to distinguish campaigning from legislating. In particular, they state: ". . . Government Code Section 82015 defines 'contribution' as 'a payment . . . except to the extent that full and adequate consideration is received unless it is clear from the surrounding circumstances that it is not made for political purposes.' [¶] This definition makes a payment a 'contribution' *unless* it is *not* made for a political purpose. The use of the *double negative* means that if there is a single political purpose, then a payment made with such purpose is a contribution. That is, if there are multiple purposes, *one* of which is a political purpose, a payment made for the multiple purposes is a contribution notwithstanding the existence of non-political purposes. [¶] Since the definition of 'payment' in *Government Code* Section 82044 includes *in-kind* services, any rendering of service, *one* of the purposes of which is a political purpose, is a contribution within the meaning of Section 82015. The Administrative Code further defines political purposes in 2 *California Administrative Code* Section 18215 as meaning, 'made for the purpose of influencing or attempting to influence the action of the voters for or against the nomination or election of a candidate . . . .' "

As we have previously indicated, however, the alleged activities in the present case were unambiguously political. Of course, there may be certain marginal activities which are neither specifically included by the act's campaign disclosure provisions nor excluded from them. Thus, there may be some ambiguity as to whether certain activities by legislators are "contributions." However, any ambiguity can be cured through regulations or judicial constructions which draw clear lines for the marginal cases. The FPPC points out that analogous line-drawing is required and has taken place in other types of campaign activity. For example, some supporters of Proposition 5 on the November 1978 ballot, the "no-smoking initiative," urged that the expenses of regular commercial advertising of cigarettes should be reported as "expenditures" against the measure. They argued that the advertising costs are incurred for the "political purpose" of influencing voters with respect to a pending ballot measure. However, the Commission's regulations make it clear that the costs of such regular commercial advertising are not required to be reported.[3]

With respect to campaign activities by publicly paid staff, the FPPC acknowledges that a situation may arise in which lines are difficult to draw, although no such difficulty is presented by the instant case. Therefore, the FPPC advises us in its reply brief that pursuant to its rule making authority, it is now preparing to take public testimony and to develop guidelines which will eliminate any possible ambiguity with respect to campaign activities involving public employees, office facilities and supplies. The solution to any ambiguity that may exist in the statute is to develop clear, enforceable standards for the marginal cases, not, as respondents suggest, to eliminate the reporting requirement entirely.

Respondents' next argument is that the stated policy of the Political Reform Act, along with the arguments in the voter's handbook accompanying the initiative measure, show that the act was intended to apply only to private entities. Indeed the act and the handbook demonstrate a preoccupation with the influence of private campaign contributions on elections. But a very obvious reason for the absence of

---

[3]Title 2, California Administrative Code, section 18225, subdivision (c) provides that the cost of communications incurred by entities which do not exist primarily for political purposes are reportable only if the communications "expressly advocate" the passage or defeat of a "clearly identified" ballot measure. Title 2, California Administrative Code, sections 18215 and 18225 were adopted in response to the standards announced in *Buckley* v. *Valeo* (1976) 424 U.S. 1, 76 [46 L.Ed.2d 659, 720, 96 S.Ct. 612], in which the Supreme Court construed the phrase "for the purpose of . . . influencing" as used to define "contribution" and "expenditure" in the Federal Election Campaign Act of 1971. The court narrowed the meaning of the term to avoid potential vagueness problems.

discussion of *public* campaign contributions is not that the act intended such to remain secret and undisclosed, but that contributions by governmental entities to political campaigns are per se illegal. Gifts of public money to private persons, associations, or corporations are prohibited by article XVI, section 6 of the California Constitution. (See also *Stanson* v. *Mott, supra,* 17 Cal.3d 206, and *Miller* v. *Miller,* 87 Cal.App.3d 762 [151 Cal.Rptr. 197].) It was thus inconceivable in 1974 to the draftsmen of the initiative measure, and to the electorate, that public funds would be expended by or for the benefit of certain legislators to reelect themselves rather than their adversaries. Hence the need to specify such a proscription in the act would have been deemed unnecessary, and even demeaning to lawmakers and public employees generally. It does not follow however that such expenditures were meant to be unreportable, for the electorate would then be saying in effect: "We recognize that such a use of public money is illegal and unconstitutional, but where it nonetheless occurs, it may be kept secret." This is absurd. The act's silence bespeaks incredulity that such practices would occur rather than an intent to exempt them from disclosure.

The act undeniably was intended to deal comprehensively with the influence of money, *all money,* on electoral and governmental processes. Its paramount purpose, as expressed in section 81002, subdivision (a), is that "[r]eceipts and expenditures in election campaigns should be fully and truthfully disclosed in order that the voters may be fully informed and *improper practices may be inhibited."* (Italics added.) It would be anomalous in the extreme to hold that such a blatantly improper practice as a gift of public money to a candidate was nevertheless intended to remain undisclosed under the act.[4]

■ Respondents attempt to find some significance in the fact that although the definition of "person" in section 82047 does not expressly mention governmental agencies, including the Legislature, the Legislature is included in the definition of "State Agency" in section 82049. On the basis of this and other definitional sections separately defining various public and private entities, respondents discern an intent by the act to provide separate treatment for each. This, however, adds little to the previous arguments. The fact remains that the act intended all contributions to be disclosed, and we cannot lightly assume from the fact that the Legislature is expressly included elsewhere, that it and other public

---

[4] " 'Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.' " Brandeis, Other People's Money p. 62 quoted in *Buckley* v. *Valeo, supra,* 424 U.S. at p. 67 [46 L.Ed.2d at p. 715].)

entities were intended to be excluded from the definition of "person" for purposes of reporting contributions.

Section 82047's definition of "person" broadly includes ". . . any other organization or group of persons acting in concert." The Legislature and the Assembly Democratic Caucus are unmistakably "other organization[s] or group[s] of persons acting in concert," and thus literally within the definition. Contrary to respondents' argument, there is no circular reasoning involved in this conclusion, because the individual legislators are undoubtedly persons, i.e., individuals, and the Legislature is therefore an "other (not previously listed) . . . group of persons," i.e., individuals. It is irrelevant that the Constitution describes the Legislature as a body composed of the Senate and the Assembly, since each of these houses is in turn composed of individuals.

Respondents object to the FPPC's reliance upon general case law holding that public entities are included among "persons" in statutory language unless inclusion would infringe upon sovereign governmental powers (as we have seen, there would be no infringement here). (See e.g., *City of Los Angeles* v. *City of San Fernando* (1975) 14 Cal.3d 199, 276-277 [123 Cal.Rptr. 1, 537 P.2d 1250]; *Regents of University of California* v. *Superior Court (Regan)* (1976) 17 Cal.3d 533, 536 [131 Cal.Rptr. 228, 551 P.2d 844]; *Bing* v. *City of Duarte* (1967) 65 Cal.2d 627 [55 Cal.Rptr. 920, 422 P.2d 608].) They argue that this principle is not applicable because the term "person" is defined in the act. But as above explained, the definition leaves open the possibility that the Legislature is a person. The fact that the word is defined does not prevent the application of the general rule set out in case law above. Accordingly, consistent with the general rule, we hold that public entities are included within the definition of "person" in section 82047.

Respondents conclude their contentions by cataloging the various reporting requirements that would be imposed on the Legislature if it were deemed a person under section 82047, arguing that somehow these requirements infringe on lawful and sovereign legislative activities. But we do not see how bringing the glare of sunshine into the legislative process infringes on any legitimate sovereign interest.

Respondents suggest that it cannot "be lightly inferred that the Political Reform Act intended that the Legislature should establish a separate system of bookkeeping and recording and a separate treasurer and separate controls over the activities of legislative aides." Bookkeep-

ing, recording, and a separate treasurer are of course unnecessary if the Legislature stays within the law. As for controls over legislative aides, if such controls do not now exist, this case may demonstrate a need for them if the FPPC's allegations are ultimately sustained.

The judgments in both cases are reversed, except only for the portion of the Suitt v. FPPC judgment which awards attorney fees (no appeal having been taken therefrom). Appellant shall recover costs on appeal.

Regan, Acting P. J., and Reynoso, J., concurred.

A petition for a rehearing was denied April 3, 1979, and the judgment was modified to read as printed above.