[No. C026314. Third Dist. Feb. 10, 1998.]

CALIFORNIANS FOR POLITICAL REFORM FOUNDATION, Plaintiff and Respondent, v.
FAIR POLITICAL PRACTICES COMMISSION, Defendant and Appellant.

**COUNSEL**

Steven G. Churchwell and Deborah Maddux-Allison for Defendant and Appellant.

Bell, McAndrews & Hiltachk, Charles H. Bell, Thomas W. Hiltachk, Olson, Hagel, Fong, Leidigh, Waters & Fishburn, N. Eugene Hill, George Waters and Mary-Beth Moylan as Amici Curiae on behalf of Defendant and Appellant.

Tony Miller for Plaintiff and Respondent.

**OPINION**

**PUGLIA, P. J.**—The Fair Political Practices Commission (Commission) appeals from a judgment granting a peremptory writ of mandate directing it to vacate, *ab initio,* an emergency regulation which provides that certain payments by a sponsoring organization to its political action committee are not contributions as defined by the Political Reform Act of 1974 (the Act) (Gov. Code, § 81000 et seq.). The Commission contends the superior court

erred in concluding the regulation conflicts with the Act. We agree and shall reverse with directions to the superior court to enter judgment denying the petition.

In November 1996, California voters passed Proposition 208, an initiative measure limiting campaign contributions and spending. Proposition 208 became effective January 1, 1997. Among the express purposes of the initiative are "[t]o ensure that individuals and interest groups in our society have a fair and equitable opportunity to participate in the elective and governmental processes" and "[t]o minimize the potentially corrupting influence and appearance of corruption caused by excessive contributions and expenditures in campaigns by providing for reasonable contribution and spending limits for candidates." (Gov. Code, § 85102, subds. (a), (b); further statutory references to sections of an undesignated code are to the Government Code.)[1]

Labor unions, trade associations, corporations and other similar organizations typically make political contributions through a committee, known as a political committee or a political action committee (political committee or PAC). Under the Act, a PAC is a "sponsored committee." (§ 82048.7, subd. (a).) The sponsoring organization establishes and operates the PAC and collects the political contributions of members and supporters. The PAC then pools these funds and from the pooled funds makes contributions to candidates or causes that advance the common political objectives of the PAC and its contributors. The sponsoring organization also typically provides all or most of the funds and in-kind services necessary to administer its PAC, paying rent or otherwise providing office space, and defraying the cost of utilities, supplies, salaries, and legal and accounting fees incurred to comply with relevant disclosure laws. Section 82048.7, which sets forth the criteria for determining when a "person" sponsors a PAC, provides:

"(a) 'Sponsored committee' means a committee, other than a candidate controlled committee, which has one or more sponsors. Any person, except a candidate or other individual, may sponsor a committee.

"(b) A person sponsors a committee if any of the following apply:

---

[1]On January 6, 1998, a federal district court enjoined the Commission from enforcing any of the provisions of Proposition 208 (*California Prolife Council* v. *Scully* (E.D.Cal. 1998) 989 F.Supp. 1282). The district court held the monetary limits on political contributions imposed by Proposition 208 are unconstitutional because they "restrain political speech in violation of the First Amendment." (989 F.Supp. at p. 1297.) The district court decision is not final. The adversaries in this appeal, who joined as defendant-intervenors in the federal action in defending the constitutionality of Proposition 208, agree that the federal court ruling has no effect on this appeal.

"(1) The committee receives 80 percent or more of its contributions from the person or its members, officers, employees, or shareholders.

"(2) The person collects contributions for the committee by the use of payroll deductions or dues from its members, officers, or employees.

"(3) The person alone or in combination with other organizations, provides all or nearly all of the administrative services for the committee.

"(4) The person, alone or in combination with other organizations, sets the policies for soliciting contributions or making expenditures of committee funds."

Under the Act, a "person" includes an individual, business organization, and any other organization or group acting in concert. (§ 82047.)[2]

Proposition 208 amended the Act in several ways, among them, by limiting the amount PAC's may contribute to candidates for state and local office. The maximum amount of such contribution is either $100, $250 or $500, depending on the population of the electoral district in which the supported candidate stands for election.[3]

---

[2]Section 82047 defines a "person" as: "[A]n individual, proprietorship, firm, partnership, joint venture, syndicate, business trust, company, corporation, limited liability company, association, committee, and any other organization or group of persons acting in concert."

[3]Section 85301 was amended by Proposition 208 to provide in relevant part:

"(a) Except as provided in subdivision (a) of Section 85402 and Section 85706, no person, other than small contributor committees and political party committees, shall make to any candidate or the candidate's controlled committee for local office in districts with fewer than 100,000 residents, and no such candidate or the candidate's controlled committee shall accept from any person a contribution or contributions totaling more than one hundred dollars ($100) for each election in which the candidate is attempting to be 'on the ballot or is a write-in candidate.

"(b) Except as provided in subdivision (b) of Section 85402 and Section 85706, no person, other than small contributor committees and political·party committees, shall make to any candidate or the candidate's controlled committee campaigning for office in districts of 100,000 or more residents, and no such candidate or the candidate's controlled committee shall accept from any such person a contribution or contributions totaling more than two hundred fifty dollars ($250) for each election in which the candidate is attempting to be on the ballot or is a write-in candidate.

"(c) Except as provided in subdivision (c) of Section 85402, no person, other than small contributor committees and political party committees, shall make to any candidate or the candidate's controlled committee for statewide office, and no such candidate or the candidate's controlled committee shall accept from any such person a contribution or contributions totaling more than five hundred dollars ($500) for each election in which the candidate is attempting to be on the ballot or is a write-in candidate."

Proposition 208 also limits to a maximum of $500 the amount that any person can contribute to a PAC in a calendar year. (§ 85301, subd. (d).)[4] Moreover, a PAC that makes independent expenditures for or against a candidate totaling $1,000 or more shall not accept a contribution from any person in excess of $250 per election. (§ 85500, subd. (b).)[5]

Given the strict limits imposed by Proposition 208 on "contributions" to PAC's, it is not surprising that the controversy between the parties in this case turns on the definition of "contribution" in the Act. Section 82015 defines a "contribution" as "a payment . . . except to the extent that full and adequate consideration is received unless it is clear from the surrounding circumstances that it is not made for political purposes."[6] Section 82015 preexisted Proposition 208 and was not changed by it.

At the time Proposition 208 was enacted, the Commission's regulations deemed a payment to be for "political purposes" if it was (1) made "[f]or the purpose of influencing or attempting to influence the action of the voters for or against the nomination or election of a candidate or candidates, or the qualification or passage of any measure," or (2) received by "[a]n organization formed or existing primarily for political purposes, including, but not limited to, a political action committee established by any membership organization, labor union or corporation." (Cal. Code Regs., tit. 2, § 18215,

---

[4]Section 85301, subdivision (d) provides:

"(d) No person shall make to any committee that contributes to any candidate and no such committee shall accept from each such person a contribution or contributions totaling more than five hundred dollars ($500) per calendar year. This subdivision shall not apply to candidate-controlled committees, political party committees, and independent expenditure committees."

[5]Section 85500 provides in relevant part:

"(a) Any committee that makes independent expenditures of more than one thousand dollars ($1,000) in support of or in opposition to any candidate shall notify the filing officer and all candidates running for the same seat within 24 hours by facsimile transmission or overnight delivery each time this threshold is met. The commission shall determine the disclosure requirements for this subdivision and shall establish guidelines permitting persons to file reports indicating ongoing independent expenditures.

"(b) Notwithstanding subdivision (d) of Section 85301, any committee that makes independent expenditures of one thousand dollars ($1,000) or more supporting 'or opposing a candidate shall not accept any contribution in excess of two hundred fifty dollars ($250) per election. . . ."

[6]Section 82015 states in relevant part: " 'Contribution' means a payment, a forgiveness of a loan, a payment of a loan by a third party, or an enforceable promise to make a payment except to the extent that full and adequate consideration is received unless it is clear from the surrounding circumstances that it is not made for political purposes. An expenditure made at the behest of a candidate, committee or elected officer is a contribution to the candidate, committee or elected officer unless full and adequate consideration is received for making the expenditure."

subd. (a)(1), (a)(2)(D); further references to regulations (Regs.) are to sections in title 2.) Regs. section 18419, subdivision (c)(1) stated in relevant part: "A sponsoring organization makes contributions and expenditures in support of its sponsored committee when it provides the committee with member contributions, money from its treasury, supplies or administrative services . . . ." According to the Commission, this regulation was adopted in 1977 simply to ensure that such payments were fully disclosed and reported.

After the passage of Proposition 208, the Commission reconsidered the Act and its implementing regulations. Of particular concern were the limits imposed by Proposition 208 on contributions to PAC's. The Commission recognized that as a result of existing regulations, a PAC that relied on its sponsoring organization to assume overhead and administrative expenses was now faced with the prospect of a $500 annual limit on the amount the sponsoring organization could provide for such expenses. If the cash and in-kind services provided by a sponsor for the administrative overhead of its sponsored PAC were deemed "made for political purposes" (§ 82015) within the meaning of the Act, as the existing regulations provided, the contribution limits of Proposition 208 would effectively prohibit a sponsor from paying for all or even most of the overhead for its sponsored PAC.

Realizing that most small and intermediate size PAC's would cease to exist were they limited to no more than $500 per calendar year from their sponsoring organization, and that it would be all but impossible for an organization to sponsor a new PAC if the seed money required to do so were counted against the same $500 cap, Commission staff proposed an emergency regulation to "undo" the regulatory classification of administrative support as a "contribution." The Commission proposed an amendment to Regs. section 18215 to exclude payments for administrative expenses from the definition of "contribution."

The Commission rejected the proposed regulation at its December 1996 meeting. Thereafter, two interested parties, plaintiff, Californians for Political Reform Foundation and Charles Bell, a member of the California Political Attorneys Association (representing amici curiae in this action), indicated they would negotiate compromise language for the regulation.[7] As a result, Commission staff presented an amended version of the proposed regulation for consideration at a January meeting of the Commission.

---

[7]Bell has filed a brief supporting the position of the Commission on behalf of amici curiae National Tax Limitation Committee, California Mobilehome Parkowners' Alliance, California Mobilehome Parkowners' Alliance Political Action Committee, and Colleen C. McAndrews. Another amicus curiae brief has been filed by Laborers' International Union of North America, AFL-CIO, Local 185 in support of the Commission.

The Commission heard comments from interested parties at the January meeting. Those in favor of the emergency regulation stated that unless it was adopted, many PAC's would be closed down because their sponsors would be prohibited from funding their administrative overhead; moreover, the $500 limitation on a sponsor providing overhead expenses was particularly unrealistic now because of the increased administrative burden imposed by Proposition 208. One speaker made the point that if a sponsor was allowed to pay all administrative costs, that would increase the political participation of contributors to the PAC, and thus reduce corruption. Another argued there was no governmental interest in limiting a sponsoring organization from supporting its PAC. A representative of the California Teachers Association pointed out that a sponsoring organization usually provides office space for the PAC, and that most PAC's would be evicted if the proposed regulation was not passed.

An opponent of the proposed regulation, one of the drafters of Proposition 208, argued the Commission lacked authority to adopt the regulation. He noted that the drafters of Proposition 208, aware that federal law provides an exemption for administrative and establishment costs for PAC's, purposely did not include a similar exemption.

The Commission adopted the emergency regulation as proposed by staff. (Regs. § 18215, subd. (c)(16).) The regulation provides in relevant part that the term "contribution" does not include "[a] payment by a sponsoring organization for the establishment and administration of a sponsored committee . . . ." (Regs. § 18215, subd. (c)(16).) " 'Establishment and administration' " are defined as "the cost of office space, phones, salaries, utilities, supplies, legal and accounting fees, and other expenses incurred in setting up and running a sponsored committee." (Regs. § 18215, subd. (c)(16).) Under the emergency regulation, however, such administrative payments and expenses must still be disclosed in public reports. (Regs. § 18215, subd. (c)(16).)[8]

---

[8]The emergency regulation (Regs. § 18215, subd. (c)(16)) states in full: "Notwithstanding any other provision of this section, the term 'contribution' does not include: . . . [a] payment by a sponsoring organization for the establishment and administration of a sponsored committee, provided such payments are reported. Any monetary payment made under this subdivision to the sponsored committee shall be made by separate instrument. A 'sponsoring organization' may be any person (see Gov. Code § 82047) except a candidate or other individual (see Gov. Code § 82048.7). 'Establishment and administration' means the cost of office space, phones, salaries, utilities, supplies, legal and accounting fees, and other expenses incurred in setting up and running a sponsored committee."

Plaintiff petitioned in the superior court for a writ of mandate, contending the emergency regulation violated Proposition 208.[9] The superior court issued an alternative writ, directing the Commission to rescind the regulation, *ab initio,* or show cause why it should not. Following hearing and argument, the court ruled for petitioner, explaining the reasons for its decision orally from the bench. The court concluded the Commission was without the authority to redefine by regulation the term "contribution" so as to exclude therefrom payments by a sponsoring organization to administer its PAC. The court ordered a peremptory writ of mandate to issue, directing the Commission to vacate *ab initio* the emergency regulation, and awarding plaintiff costs and attorney fees.

The Commission appealed and also sought extraordinary writ relief in this court. We denied the writ petition, finding that as the emergency regulation would be superseded or expire, the remedy of appeal was adequate.

The emergency regulation expired May 21, 1997, 120 days after it was adopted. (See § 11346.1, subd. (c).) In June 1997, the Commission adopted a permanent regulation identical in all respects to the lapsed emergency regulation. (Regs. § 18215, subd. (c)(16).)

I

Notwithstanding expiration of the emergency regulation which is the subject of the superior court writ of mandate, we conclude the appeal is not moot. While the repeal, or here the expiration, of the statute or regulation under consideration may render an appeal moot, that is not the case where a material portion of the statute or regulation is reenacted so that the superior court's judgment subsists after, as well as before, the change. (*Montalvo* v. *Madera Unified Sch. Dist. Bd. of Education* (1971) 21 Cal.App.3d 323, 329 [98 Cal.Rptr. 593].) After the emergency regulation expired, the Commission adopted a permanent regulation identical in all respects to the expired emergency regulation. The appeal is not moot. (*Davis* v. *Superior Court* (1985) 169 Cal.App.3d 1054, 1058, fn. 3 [215 Cal.Rptr. 721].)

II

The Act, as amended by Proposition 208, prohibits a PAC from accepting from any person a contribution totaling more than $500 per calendar year. (§ 85301, subd. (d).) The challenged emergency regulation

---

[9]The Commission also made conforming changes to Regs. section 18419, subdivisions (c)(1) and (d)(2) to exclude establishment and administrative costs as contributions and to require that such costs be reported. Since these changes were made after the petition for writ of mandate was filed, the petition does not specifically challenge them.

excepted from the statutory definition of "contribution" payments by a sponsoring organization to establish and administer its PAC. (Regs. § 18215, subd. (c)(16).) The issue before us is whether the Commission exceeded its authority in amending its own regulation to provide that payments of a sponsor for the establishment and administration of its PAC were no longer to be considered "contributions." Because the question is one of law, we review the judgment of the superior court de novo. (*Evans* v. *Unemployment Ins. Appeals Bd.* (1985) 39 Cal.3d 398, 407 [216 Cal.Rptr. 782, 703 P.2d 122].)

Since its adoption in 1974, the Act has defined the term "contribution" broadly to include "a payment . . . except to the extent that full and adequate consideration is received unless it is clear from the surrounding circumstances that it is not made for political purposes." (§ 82015.) A "payment" is defined as a "payment, distribution, transfer, loan, advance, deposit, gift or other rendering of money, property, services or anything else of value, whether tangible or intangible." (§ 82044.)

The task of more narrowly defining which "payments" are not "contributions", i.e., which are "not made for political purposes," has been left to the Commission (*Thirteen Committee* v. *Weinreb* (1985) 168 Cal.App.3d 528, 532 [214 Cal.Rptr. 297]; *Fair Political Practices Com.* v. *Suitt* (1979) 90 Cal.App.3d 125, 130-131 [153 Cal.Rptr. 311]). The Commission has adopted, and over the years amended many times, a regulation that expressly includes some types of payments as contributions but excludes others. (Regs. § 18215.)[10]

---

[10] At the time Proposition 208 was enacted, Regs. section 18215 provided:

"(a) A contribution is any payment made for political purposes for which full and adequate consideration is not made to the donor. A payment is made for political purposes if it is:

"(1) For the purpose of influencing or attempting to influence the action of the voters for or against the nomination or election of a candidate or candidates, or the qualification or passage of any measure; or

"(2) Received by or made at the behest of the following or any agent thereof:

"(A) A candidate;

"(B) A controlled committee;

"(C) An official committee of a political party, including a state central committee, county central committee, assembly district committee or any subcommittee of such committee; or

"(D) An organization formed or existing primarily for political purposes, including, but not limited to, a political action committee established by any membership organization, labor union or corporation.

"(b) The term 'contribution' includes:

"(1) Any payment made to a person or organization other than a candidate or committee, when, at the time of making the payment, the donor knows or has reasons to know that the payment, or funds with which the payment will be commingled, will be used to make contributions or expenditures. If the donor knows or has reason to know that only part of the

Section 83112 empowers the Commission to adopt, amend, and rescind regulations to carry out the purposes and provisions of the

---

payment will be used to make contributions or expenditures, the payment shall be apportioned on a reasonable basis in order to determine the amount of the contribution.

"There shall be a presumption that the donor does not have reason to know that all or part of the payment will be used to make expenditures or contributions, unless the person or organization has made expenditures or contributions of at least one thousand dollars ($1,000) in the aggregate during the calendar year in which the payment occurs, or any of the immediately preceding four calendar years.

"(2) A candidate's own money or property used on behalf of his or her candidacy.

"(3) Any goods or services received by or behested by a candidate or committee at no charge or at a discount from the fair market value, unless the discount is given in the regular course of business to members of the public.

"(c) Notwithstanding any other provisions of this section, the term 'contribution' does not include:

"(1) An expenditure made at the behest of a candidate in connection with a communication directed to voters or potential voters as part of voter registration activities or activities encouraging or assisting persons to vote, if the expenditure does not constitute express advocacy.

"(2) Volunteer personal services or payments made by a person for his or her own travel expenses, if such payments are made voluntarily without any understanding or agreement that he or she will be repaid.

"(3) A payment made by an occupant of a home or office for costs related to any meeting or fundraising event held in the occupant's home or office, if the total cost of the meeting or fundraising event is $500 or less, exclusive of the fair rental value of the premises.

"(4) A payment made at the behest of a candidate, which is for a communication by the candidate or any other person, that meets all of the following:

"(i) Does not contain express advocacy.

"(ii) Does not make reference to the candidate's candidacy for elective office, the candidate's election campaign, or the candidate's or his or her opponent's qualifications for office; and

"(iii) Does not solicit contributions to the candidate or to third persons for use in support of the candidate or in opposition to the candidate's opponent.

"(5) A payment made by a candidate or committee for another candidate to attend the paying candidate's or committee's fundraiser.

"(6) A payment made by a candidate for a communication publicizing his or her endorsement by another candidate, provided that the communication does not expressly advocate the nomination or election of the endorsing candidate or the defeat of an opponent of the endorsing candidate.

"(7) A payment made by a ballot measure committee for a communication in which the ballot measure supported or opposed by the committee is endorsed or opposed by a candidate, and the communication does not expressly advocate the nomination or election of the endorsing candidate or the defeat of an opponent of the endorsing candidate.

"(8) A payment by:

"(i) A regularly published newspaper, magazine or other periodical of general circulation which routinely carries news, articles, and commentary of general interest for the cost of publishing a news story, commentary or editorial; or

"(ii) A federally regulated broadcast outlet for the cost of broadcasting a news story, commentary, or editorial.

Act.[11] Section 83112 was not affected by Proposition 208.[12] Accordingly, further refinement of the term "contribution" to accord with changes in the Act effected by Proposition 208 remains the province of the Commission. In order to effectuate the purposes of the Act as amended by Proposition 208, the Commission determined that the cash and in-kind services provided by a sponsoring organization to establish and administer its PAC are not payments for political purposes, and thus not contributions subject to the $500 limitation in section 85301, subdivision (d).

In our view, the emergency regulation is a reasonable construction of a statute the enforcement of which is confided to the Commission. While section 85301, subdivision (d), limits to $500 per year the amount a person

---

"(9) A payment by an organization for its regularly published newsletter or periodical, if the circulation is limited to the organization's members, employees, shareholders, other affiliated individuals and those who request or purchase the publication. This exception applies only to the costs regularly incurred in publication and distribution. Any additional costs incurred are contributions, including, but not limited to, expanded circulation; substantial alterations in size, style, or format; or a change in publication schedule, such as a special edition.

"(10) A payment for a debate or other forum sponsored by a nonpartisan organization in which at least two candidates appearing on the ballot for the same elective office were invited to participate.

"(11) A payment for a debate or other forum in which the proponent of a ballot measure and at least one opponent, or their respective representatives, were invited to participate in equal numbers.

"(12) A payment for a debate or other forum sponsored by a political party or affiliated committee in which a majority of the candidates for that party's nomination were invited to participate.

"(13) A payment made by a bona fide service, social, business, trade, union or professional organization or group for reasonable overhead expenses associated with the organization's regularly scheduled meeting at which a candidate or an individual representing either side of a ballot measure speaks, if the organization pays no additional costs in connection with the speaker's attendance.

"(14) A payment received by, directed by, or made at the behest of a candidate for personal purposes. [NOTE: Such payments may constitute gifts, income, or honoraria, and as such may be limited or prohibited, under other provisions of the Act. See also Title 2, California Code of Regulations, Section 18941.1 regarding payments for food.]

"(15) A payment made by a candidate for a communication in support of or opposition to a ballot measure, if the communication features the endorsing candidate or clearly identifies him or her as the sponsor of the communication. [NOTE: this exception does not include a monetary contribution from a candidate or his or her controlled committee to a ballot measure committee.]"

[11]Section 83112 provides in relevant part: "The Commission may adopt, amend and rescind rules and regulations to carry out the purposes and provisions of [the Act], and to govern procedures of the Commission. These rules and regulations . . . shall be consistent with [the Act] and other applicable law."

[12]Section 85202, adopted as part of Proposition 208, provides: "Unless specifically superseded by this act, the definitions and provisions of [the Act] shall govern the interpretation of this law."

may contribute to a PAC, the section does not define the word "contribution" nor does it limit the Commission's authority to interpret "contribution." Moreover, Proposition 208 is entirely silent on the issue of administrative expenses. In light thereof, this court would be hard put to find the Commission exceeded its authority in adopting the emergency regulation. (*Morris* v. *Williams* (1967) 67 Cal.2d 733, 749 [63 Cal.Rptr. 689, 433 P.2d 697] [A court will not " 'superimpose its own policy judgment upon the agency in the absence of an arbitrary or capricious decision.' "].)

■ "[B]ecause of the agency's expertise, its view of a statute or regulation it enforces is entitled to great weight unless clearly erroneous or unauthorized." (*Pacific Legal Foundation* v. *Unemployment Ins. Appeals Bd.* (1981) 29 Cal.3d 101, 111 [172 Cal.Rptr. 194, 624 P.2d 244]; see also *Henning* v. *Industrial Welfare Com.* (1988) 46 Cal.3d 1262, 1269 [252 Cal.Rptr. 278, 762 P.2d 442] [" ' "[T]he construction of a statute by officials charged with its administration . . . is entitled to great weight". . . .' "].) The Commission is one of those agencies whose expertise is entitled to deference from the courts. (*Thirteen Committee* v. *Weinreb, supra,* 168 Cal.App.3d at pp. 532-533.) Moreover, where the regulation at issue is one deemed necessary to effectuate the purposes of the statute, we apply a more deferential standard of review, requiring only that the regulation be reasonable. (*Henning* v. *Division of Occupational Saf. & Health* (1990) 219 Cal.App.3d 747, 757-758 [268 Cal.Rptr. 476].) This is particularly true where, as here, the quasi-legislative decisions of the Commission involve controversial issues that would entangle the courts in a "political thicket." The United States Supreme Court has held the Commission's federal counterpart, the Federal Election Commission, "is precisely the type of agency to which deference should presumptively be afforded." (*FEC* v. *Democratic Senatorial Campaign Comm.* (1981) 454 U.S. 27, 37 [102 S.Ct. 38, 45, 70 L.Ed.2d 23, 33].)

In striking down the emergency regulation, the superior court observed that the statute (§ 85301, subd. (d)), provides that "no person shall make to any committee that contributes to any candidate more than $500, leaving out some of the verbiage there. But I think subdivision (d) is clear, and I don't think that you really need to look much further than that to determine this case."

■ But the crucial distinction here, as expressed in section 85301, subdivision (d), is between a payment for and a payment not for a political purpose. The $500 limit does not apply to payments not made for a political purpose and the Commission is authorized to define by regulation, consistent

with the statute, what kinds of payments are and are not for political purposes.

The term "contribution" is a term of art. It does not and never has included all payments. In fact, at the time Proposition 208 was adopted, Regs. section 18215 excepted 15 specific kinds of payments from the definition of "contribution" because the Commission deemed them not to be campaign related, i.e., not for political purposes. (See fn. 10, *ante,* pp. 481-483.) The Commission has now added one more exception to facilitate the purposes of the Act.

Plaintiff argues that in enacting Proposition 208, the electorate expressed its intent to "freeze" into place the then-existing definition of "contribution" in the regulations. Plaintiff cites no supporting evidence for this argument. Nothing in Proposition 208 purports to define, or redefine, the term "contribution," nor is there any language which removes from the Commission its authority to regulate in this area. Moreover, there is nothing in the ballot arguments—the only extrinsic aid that may be considered to show the intent of the voters in passing an initiative (*Mobilepark West Homeowners Assn.* v. *Escondido Mobilepark West* (1995) 35 Cal.App.4th 32, 42, fn. 6 [41 Cal.Rptr.2d 393]; *C-Y Development Co.* v. *City of Redlands* (1982) 137 Cal.App.3d 926, 932-933 [187 Cal.Rptr. 370]) that addresses such issues. In fact, the ballot arguments are silent on the issue of administrative support for sponsored PAC's.

If in fact it were the intent of the proponents of the initiative to freeze into place the then-existing regulatory definition of "contribution," it would have been easy enough to do so. For example, the regulatory definition of "lobbyist" that existed at the time Proposition 208 was enacted provided a "lobbyist" was any person who received $2,000 per month or more in compensation for specific activities. (Regs. § 18419, subd. (b).) However, the then-existing statutory definition of lobbyist did not contain the $2,000 provision. (Former § 82039.) Proposition 208 amended the statutory definition of lobbyist by inserting the $2,000 criterion from the regulation. (See new § 82039.) Obviously, the drafters of the initiative were aware of the existing regulations and knew how to "freeze" into the statute an existing regulation, as well as to "freeze out" the Commission's authority to regulate in the area, if they were so inclined.[13]

In this regard, we note that one provision of Proposition 208 did create a specific exception to the previous definition of "contribution." New section

---

[13]In support of its claim the voters in enacting Proposition 208 specifically intended that administrative and start up support to a sponsored PAC from its sponsoring organization be subject to the initiative's contributions limits, plaintiff offers various analyses prepared by the Commission, the Senate Office of Research Analysis, and the Californians for Political Reform. There is nothing in the record before us which shows that a single voter was aware

85312 provides: "The costs of internal communications to members, employees, or shareholders of an organization, other than a political party, for the purpose of supporting or opposing a candidate or candidates for elective office or a ballot measure or measures shall not be considered a contribution or independent expenditure under the provisions of this act, provided such payments *are not for the costs of campaign materials or activities used in connection with broadcasting, newspaper, billboard, or similar type of general public communication.*" (Italics added.)

Section 85312 raises a strong inference the proponents of the initiative deemed there to be a distinction between payments which traditionally have been considered to be for political purposes, e.g., to pay for advertising etc. that is intended to influence the action of the voters, and internal communications among members which, like administrative expenses, do not involve direct public advocacy.[14] The promulgation by the Commission of emergency regulation section 18215, subdivision (c)(16) thus is entirely consistent with the Act.

The emergency regulation is also consistent with the purposes of Proposition 208. Among those purposes are "[t]o minimize the potentially corrupting influence and appearance of corruption caused by excessive contributions" (§ 85102, subd. (b)), "[t]o reduce the influence of large contributors with a specific financial stake in matters before government" (§ 85102, subd. (c)), and "[t]o limit overall expenditures in campaigns" (§ 85102, subd. (e)).[15] The Commission could reasonably find that even lavish funding for overhead costs not directly related to political advocacy poses little or no danger of corrupting the political process and that the influences, if any,

---

of any of these analyses; thus, these analyses are not properly considered when determining the intent of the voters. (Cf. *Mobilepark West Homeowners Assn.* v. *Escondido Mobilepark West, supra,* 35 Cal.App.4th at p. 42, fn. 6; see *Legislature* v. *Eu* (1991) 54 Cal.3d 492, 504 [286 Cal.Rptr. 283, 816 P.2d 1309]; see also *People* v. *Hazelton* (1996) 14 Cal.4th 101, 106-107 & fn. 2 [58 Cal.Rptr.2d 443, 926 P.2d 423].) A similar analysis applies to the declarations of various proponents of the initiative offered by plaintiff. (*C-Y Development Co.* v. *City of Redlands, supra,* 137 Cal.App.3d 926, 932-933 [The courts disregard the declarations of the drafters of an initiative inasmuch as such declarations are not persuasive to show the voters' intent].)

[14]As we have noted, *supra,* Regs. section 18225 states in relevant part that a payment is made for political purposes if it is made "[f]or the purpose of influencing or attempting to influence the action of the voters for or against the nomination or election of a candidate or candidates, or the qualification or passage of any measure . . . ." (Regs. § 18225, subd. (a)(1).)

[15]Section 85102 states in full:

"The people enact this law to accomplish the following separate but related purposes:

"(a) To ensure that individuals and interest groups in our society have a fair and equitable opportunity to participate in the elective and governmental processes.

such expenditures may have on the political process can be adequately monitored by keeping the public fully informed as to their source. It follows that payments by a sponsoring organization for the administrative costs of its PAC, which include sums expended to ensure legal compliance with the Act, are simply not the kinds of payments which raise the specter of corruption or the appearance of corruption, i.e., there is no nexus between limits on a sponsor's expenditures for the administrative support of its PAC and the insulation of candidates for public office and the political process from corrupting influences, particularly when such administrative expenditures must be fully disclosed. (See §§ 81001, 81002.)

Another express purpose of the initiative is "[t]o ensure that individuals and interest groups in our society have a fair and equitable opportunity to participate in the elective and governmental process." (§ 85102, subd. (a).) The Commission recognized that after the imposition of strict spending limits brought about by passage of Proposition 208, any regulation which deemed payments for administrative expenses to be contributions would frustrate this intended purpose. That is to say, any regulation which prohibits a PAC from receiving more than $500 per year from its sponsoring organization would have the effect of putting many PAC's out of business.[16] Even those political committees that could survive would be hard pressed to absorb their administrative costs and still maintain an effective voice on behalf of the candidates and causes which they and their supporters wish to support. Moreover, it would be unrealistic to believe any new PAC's could be established if the sponsoring organization were limited to a start-up contribution of $500. Putting established PAC's out of business, and preventing new PAC's from being formed, is hardly the way "[t]o ensure that

---

"(b) To minimize the potentially corrupting influence and appearance of corruption caused by excessive contributions and expenditures in campaigns by providing for reasonable contribution and spending limits for candidates.

"(c) To reduce the influence of large contributors with a specific financial stake in matters before government by severing the link between lobbying and campaign fundraising.

"(d) To lessen the potentially corrupting pressures on candidates and officeholders for fundraising by establishing sensible time periods for soliciting and accepting campaign contributions.

"(e) To limit overall expenditures in campaigns, thereby allowing candidates and officeholders to spend a lesser proportion of their time on fundraising and a greater proportion of their time communicating issues of importance to voters and constituents.

"(f) To provide impartial and noncoercive incentives that encourage candidates to voluntarily limit campaign contributions.

"(g) To meet the citizens' right to know the sources of campaign contributions, expenditures, and political advertising.

"(h) To enact tough penalties that will deter persons from violating this chapter and the Political Reform Act of 1974."

[16]Amicus curiae Laborers' International Union of North America represents without contradiction that the cost of compliance with the reporting provisions of the Act alone is several times greater per year than the $500 annual contribution limit.

individuals and interest groups in our society have a fair and equitable opportunity to participate in the elective and governmental processes." (§ 85102, subd. (a).)

Through Regs. section 18215, subdivision (c)(16), enacted as an emergency regulation, the Commission has endeavored to ensure that every "individual[] and interest group[] in our society [has] a fair and equitable opportunity to participate in the elective and governmental processes." (§ 85102, subd. (a).) The Commission's decision was reasonable and informed and may not be second-guessed by the courts. (*Jones* v. *California Interscholastic Federation* (1988) 197 Cal.App.3d 751, 759 [243 Cal.Rptr. 271].)

Plaintiff notes that as early as 1977, and from that time forward, the Commission has consistently held a sponsor's cash payments and in-kind services provided for the administrative expenses of its PAC to be a "contribution." However, the question before us is not whether the Commission has in the past deemed administrative expenses to be contributions, but whether the Commission in the face of substantial amendments to the Act may reexamine and reformulate its existing rules. Unquestionably it can.

██ "In the general case, of course, an administrative agency may change its interpretation of a statute, rejecting an old construction and adopting a new. [Citations.] Put simply, '[a]n administrative agency is not disqualified from changing its mind . . . .' [Citation.]" More importantly, "[e]ven when an agency adopts a new interpretation of a statute and rejects an old, *a court must continue to apply a deferential standard of review*[.]" (*Henning* v. *Industrial Welfare Com.*, *supra*, 46 Cal.3d at pp. 1269-1270, italics added; see *NLRB* v. *Iron Workers* (1978) 434 U.S. 335, 351 [98 S.Ct. 651, 661, 54 L.Ed.2d 586, 599] [When the agency does change its mind, "the courts still sit in review of the administrative decision and should not approach the statutory construction issue de novo and without regard to the administrative understanding of the statutes."].)

The Commission has asserted its earlier regulation deeming administrative expenses to be contributions was intended solely to ensure such payments were covered by the reporting and disclosure requirements of the Act as originally enacted. As the Commission notes, the Act imposed no spending limits in 1977 when the Commission promulgated its original regulation deeming administrative payments contributions. Thus the original regulation did not threaten the viability of political committees and, by extension, the opportunity for citizens to participate through them in the electoral process. With the passage of Proposition 208, however, the Commission's 1977

regulation classifying the administrative payments of sponsors to their political committees as contributions became problematic when juxtaposed with Proposition 208's contribution limits. Numerous political committees that had relied on administrative overhead payments from their sponsoring organizations suddenly found that contributions from members, rather than giving the members a voice in the political process, would have to be redirected to administrative support. Accordingly, the Commission was forced to take a hard look at its regulations, and to amend those regulations relating to administrative expenses, in order to harmonize the regulations with a purpose of the Act, i.e., to ensure that everyone is allowed to participate fairly and equally in the elective process. The basis for the Commission's emergency regulation is sound, and because the regulation is fully consistent with the Act, it is entitled to deference from this court. (*Consumers Union of U.S., Inc.* v. *California Milk Producers Advisory Bd.* (1978) 82 Cal.App.3d 433, 446-447 [147 Cal.Rptr. 265].)

Finally, while the constitutionality of the spending and contribution limits set forth in Proposition 208 is not before this court, it is clear that in making its policy determination to exclude a sponsor's payments for the establishment and administration of a sponsored PAC from the definition of "contribution," the Commission understood the constitutional implications of its decision. The Commission clearly was aware that without an administrative expenses exception, an annual limit of $500 per person on such expenditures would have a chilling effect on fundamental rights of association, speech and petition afforded by the federal and state Constitutions. (See *Buckley* v. *Valeo* (1976) 424 U.S. 1, 39-51 [96 S.Ct. 612, 644-650, 46 L.Ed.2d 659, 699-706].) To ensure the continued viability of the statute, the Commission refined the definition of "contribution" to exclude administrative expenses, expenses the Commission deems are not for political purposes in that such payments are not used expressly to advocate for the election or defeat of an identified candidate or cause. (Cf. 424 U.S. at p. 80 [96 S.Ct. at pp. 663-664, 46 L.Ed.2d at p. 722].) Once again, the Commission's emergency regulation is entitled to deference from this court.[17]

---

[17]Plaintiff mistakenly claims that any shortfall in administrative funding caused by the $500 cap can be mitigated if several organizations join together to sponsor a PAC. But if a group representing a particular interest must, in order to participate, band together with other groups and associations which are not entirely compatible, the pristine clarity of its political message will be diluted or perhaps distorted. This, of course, implicates freedom of speech and freedom of association. In arguing that Proposition 208 by its terms subjects administrative expenditures to the limits imposed on contributions, thus requiring groups to band together in order to be able to continue to participate in the political process, plaintiffs, inadvertently no doubt, have stated a cogent argument for the unconstitutionality of Proposition 208.

## III

The trial court awarded plaintiff attorney fees under Code of Civil Procedure section 1021.5. In light of our holding that the court erred in ordering a peremptory writ of mandate to issue, the award must be reversed.

The judgment and the postjudgment order awarding plaintiff costs and attorney fees are reversed. The matter is remanded to the trial court with directions to enter judgment denying the petition. The Commission shall receive its costs on appeal.

Davis, J., and Morrison, J., concurred.

Respondent's petition for review by the Supreme Court was denied April 22, 1998.